Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner.
 ***********
Accordingly, the Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The Insurance Company of the State of Pennsylvania, through its servicing agent Alexsis, provides workers' compensation coverage for defendant-employer.
3. At all times relevant herein an employer/employee relationship existed between defendant-employer and plaintiff.
4. On October 2, 1992 the Industrial Commission approved the parties' I.C. Form 21 Agreement for Compensation, which concerned plaintiff's injury by accident of May 29, 1992 (I.C. File No. 243893).
5. For the period beginning August 1, 1997, defendants stipulate that plaintiff again became entitled to temporary total disability benefits, and defendants have paid plaintiff temporary total disability benefits at the rate of $275.82 per week for the period beginning August 1, 1997 and continuing thereafter to the present. Defendants contend that on July 17, 1997 plaintiff had a change of condition for the worse from her May 29, 1992 back injury, while plaintiff contends that on July 17, 1997 she had a new injury by accident to her back, which caused her to become totally disabled starting July 18, 1997 and continuing thereafter to the present.
6. In I.C. File No. 850618, which concerns an alleged June 28, 1996 injury by accident claim against defendants, plaintiff has taken a voluntary dismissal with prejudice.
7. Defendants stipulate that by at least June 1998, plaintiff's 1992 compensable back injury resulted in her depression, which defendants agree is also compensable. Defendants agree to pay Winston-Salem psychiatrist Uma Thotakura to treat plaintiff, including payment for all medication prescribed to treat plaintiff's depression secondary to her back pain as long as such medication tends to give relief, effect a cure or lessen the period of disability.
8. The following records were received as evidence by stipulation of the parties:
 Stipulated Exhibit One, seventy-three pages of Industrial Commission proceedings; Stipulated Exhibit Two, Volume I of Plaintiff's medical records, 99 pages; Stipulated Exhibit Three, Volume II of Plaintiff's medical records, pages 100 through 189; Stipulated Exhibit Four, 46 pages of physical therapy records; Stipulated Exhibit Five, 81 pages of rehabilitation records.
9. The issues for resolution are as follows:
 (a) On July 17, 1997 did plaintiff sustain a new injury by accident to her lower back and legs?
 (b) If so, what was plaintiff's average weekly wage as of July 17, 1997?
 (c) Did plaintiff fail to give defendants written notice of her claim as required by N.C.G.S. § 97-22?
(d) If so, were defendants prejudiced thereby?
 (e) Will the Commission approve plaintiff's selection of Drs. Dichoso-Wood, McLean and Meloy to assume her care under N.C.G.S. § 97-25?
 (f) Will the Commission order defendants to pay for the cost of a home whirlpool for plaintiff?
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner with some modification and finds as follows
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 48 years old. Prior to her accident of May 29, 1992, plaintiff worked as a flight attendant for the predecessor to US Airways. She generally worked a typical schedule of 70 to 80 hours per month.
2. Plaintiff's normal duties as a flight attendant for US Airways included frequent long periods of standing and walking; serving food and beverages, which included lifting, pushing and pulling the food and beverage carts up and down the aircraft aisle; and performing other related services for up to 200 passengers per flight.
3. Plaintiff was in good health with no problems with her lower back or legs until the events of May 29, 1992. On May 29, 1992, plaintiff sustained a compensable low back injury when, as she was squatted down in front of a beverage cart, the aircraft hit air turbulence, causing the cart to move and hit plaintiff. The moving cart knocked plaintiff over into the aisle where she landed on her tailbone, lower back and buttocks areas, resulting in a low back sprain.
4. On May 29, 1992, plaintiff was a full-time flight attendant, working for defendant-employer approximately 85 hours a month. As set forth in the Form 21 and subsequent agreements, plaintiff's average weekly wage at that time was $413.73, yielding a compensation rate of $275.82.
5. Pursuant to the Form 21 Agreement and various supplemental awards, defendants have paid and plaintiff has accepted temporary total disability compensation benefits at the rate of $275.82 per week for the following periods: May 30-September 1, 1992; October 14-25, 1992; March 17-May 2, 1993; October 28-November 18, 1993; May 2-8, 1994; August 5-September 11, 1994; and September 29-December 5, 1995.
6. Following the injury of May 29, 1992, plaintiff received treatment for her back injury continuing into 1996, as provided by different physicians approved by defendants, including Dr. David N. DuPuy, a Charlotte orthopedist; Dr. Raymond Sweet, a Charlotte neurosurgeon; Dr. Daniel Bernstein at defendants' Work Well Clinic in Charlotte; and Dr. Howard Jones of Aegis Occupational Health in Winston-Salem.
7. On June 3, 1996, plaintiff first saw Dr. Howard Jones, a specialist in occupational medicine. She complained of lower back pain, which Dr. Jones diagnosed as exacerbation of plaintiff's 1992 back injury.
8. In the period from June 1996 through June 1997, plaintiff saw Dr. Jones for treatment of her chronic lower back pain complaints on about 12 different occasions. She complained to Dr. Jones of chronic low back pain, with periodic exacerbation. Based upon her continued complaints, Dr. Jones treated plaintiff with pain medication, physical therapy, work hardening and limited work hours.
9. During most of the June 1996 to June 1997 period, due to her recurring back pain, plaintiff, with Dr. Jones' approval, limited her work hours with defendant-employer to 50 to 55 hours a month, rather than the usual 70 to 80 hours per month. She continued to experience periodic flare-ups of back and bilateral leg pain.
10. A provision in the collective bargaining agreement controls the terms of employment for defendant-employer's flight attendants, and provides that the top ten percent of flight attendants, as ranked by seniority, may elect to limit their work schedule to 55 hours per month. Plaintiff did not qualify in this top ten percent by seniority.
11. Sometime in February or March 1997, plaintiff requested defendant-employer to voluntarily allow her to permanently limit her work hours to 55 hours per month. She believed that she could work 55 hours per month, despite any flare-ups of her back pain.
12. By February 6, 1997, Dr. Jones was of the opinion that plaintiff was at maximum medical improvement, and he released her to work flying duty 55 hours per month. In his March 19, 1997 letter to Alexsis, Dr. Jones supported plaintiff's request for a reduction in work hours. He based this on her subjective pain complaints, as he had no objective evidence that working in excess of 55 hours would cause any harm to her back.
13. In April or May 1997, defendant-employer rejected plaintiff's request to limit her hours to 55 per month. Plaintiff was then required by defendant-employer to either return to a flight attendant's full-time schedule of around 80 hours per month, or take a leave of absence from her employment. Plaintiff elected to return to a full-time schedule.
14. In May 1997, plaintiff continued to work about 55 hours per month. Beginning in June 1997 she increased her work hours to about 65 hours per month, as approved by Dr. Jones.
15. By late June 1997, defendant-employer scheduled plaintiff to work full-time as a flight attendant for 81 hours during the month of July 1997, and plaintiff agreed to return to work as a full-time flight attendant and to work the 81 hours as scheduled. By July 1, 1997, plaintiff had in fact returned to work as a full-time flight attendant, working around 80 hours a month, as authorized by Dr. Jones.
16. On July 17, 1997, during U.S. Airways Flight No. 3618 while over Solberg, N.J. at about 30,000 feet, the aircraft on which plaintiff was working as a full-time flight attendant encountered turbulence. In his incident report, the pilot referred to this as an "uncommanded roll of 20 to 30 degrees", which caused the aircraft to shutter and buffet. Plaintiff was standing in the galley area at the time, and was thrown off balance and knocked back hard against the galley wall, striking her lower back and legs. She immediately felt pain in her lower back, buttocks, left hip and leg.
17. The events of July 17, 1997 when the aircraft hit unexpected air turbulence and caused plaintiff to strike her lower back and legs against the aircraft's wall and injure her lower back and legs constituted an interruption of plaintiff's work routine and an injury by accident arising out of and in the course of her employment.
18. As a result of the accident on July 17, 1997, plaintiff suffered additional injury to her lower back, resulting in severe lower back pain and left leg pain. Due to her ongoing back and leg pain, plaintiff has been unable to continue to work as a flight attendant. She has been unable to earn wages in the same or any other employment since July 18, 1997.
19. After July 17, 1997, plaintiff continued under the care of Dr. Jones. On July 22, 1997, she reported to Dr. Jones the incident involving the turbulence, which threw her into the galley wall. In his letter of July 22, 1997 to Alexsis, defendant-employer's servicing agent for workers compensation, Dr. Jones mentioned this incident and the fact that it brought about a recurrence and worsening of plaintiff's back pain, with radiation into the left leg. Dr. Jones' letter of July 22 was faxed to Alexsis on July 25, 1997.
20. Plaintiff continued to experience moderate to severe lower back pain, which was managed conservatively by Dr. Jones, who also kept her out of work. Plaintiff's pain is relieved somewhat by pain medication and rest, and tends to be worsened by any period of prolonged sitting, standing or walking.
21. Prior to July 17, 1997, despite her exacerbations or flare-ups of back pain, plaintiff's condition improved and she was able to return to work in a fairly short period of time with rest and pain medication. In the period following her July 17, 1997 accident, and despite competent medical care, plaintiff has not been able to recover sufficiently from her lower back injury to return to work.
22. On September 9, 1997, plaintiff was examined by Dr. Douglas Linville, an orthopedic surgeon in Winston-Salem. She reported to Dr. Linville that she was thrown against the airplane wall during turbulence. Dr. Linville's assessment was "chronic lumbar pain secondary to reinjury at work." He noted that surgical intervention was not recommended and suggested work hardening and possibly a functional capacity evaluation. Dr. Linville's notes regarding the September 9, 1997 examination were received by Alexsis on September 22, 1997.
23. A December 9, 1997 MRI of plaintiff's lumbar spine revealed no obvious pathology different from plaintiff's previous lumbar MRI scans. Plaintiff is not a candidate for surgery at this time.
24. In February 1998, Dr. Jones wrote that he would support plaintiff in her request to be evaluated by a psychiatrist to help her deal with her persistent and chronic pain condition. By May 1998, Dr. Jones told plaintiff that he knew of no more diagnostic or therapeutic interventions to help her and he released her from his care.
25. Plaintiff then sought help from her family physician, Dr. Maria Dichoso-Wood, who referred plaintiff to Dr. Uma Thotakura, a psychiatrist. Dr. Thotakura evaluated plaintiff on June 18, 1998, and stated that since July 17, 1997 plaintiff suffered from chronic severe back pain, helplessness, hopelessness, frequent crying spells and depression. She diagnosed plaintiff's condition as adjustment disorder and depression. Plaintiff has benefited from Dr. Thotakura's treatment and continues under the doctor's care.
26. Dr. Dichoso-Wood also referred plaintiff to Dr. James M. McLean, who first saw her on September 20, 1998. Dr. McLean is the Medical Director of Whitaker Rehabilitation Center affiliated with Forsyth Medical Center in Winston-Salem. The center treats patients with chronic back pain problems, as well as other disabling conditions. Dr. McLean diagnosed plaintiff's condition as chronic pain syndrome for which he prescribed pain medicine.
27. As found by the examining and treating medical specialists, as a result of her injury by accident of July 17, 1997 and the chronic pain resulting therefrom, plaintiff has developed depression, for which psychiatric or psychological treatment has been reasonably necessary. As a result of her accidental injury, plaintiff has also developed chronic pain syndrome, for which reasonable medical treatment has been necessary.
28. Dr. McLean referred plaintiff for evaluation by the pain specialists at Piedmont Anesthesia and Pain Consultants, Drs. Meloy, Martin and Faller. The pain specialists prescribed a series of lumbar epidural steroid injections for plaintiff, as well as other pain medication. These treatments have helped give plaintiff some relief from her pain. In August 1999, pain specialist T. Stuart Meloy wrote that in his opinion plaintiff's depression precluded any recommendation of implanting a dorsal column stimulator.
29. Following a discussion with Dr. McLean, plaintiff at her own expense installed a whirlpool tub at her home. A whirlpool tub was never prescribed by Dr. McLean for plaintiff. The whirlpool is not authorized medical treatment for which defendants are responsible.
30. The medical treatments provided by Drs. Dichoso-Wood and McLean, as well as by the pain specialists, have been reasonable and have helped give plaintiff some relief from her lower back and left leg pain resulting from her July 17, 1997 accident. Plaintiff's motion to have these physicians assume her care therefore is reasonable and should be approved. As of March 2000, plaintiff continues under the care of Drs. Dichoso-Wood, McLean and Thotakura for treatment of her chronic lower back pain syndrome and depression, resulting from her July 17, 1997 accident.
31. As of the close of the evidence in this case, plaintiff's lower back pain and left leg pain resulting from her accident on July 17, 1997 continued to prevent her from being able to earn wages in any employment.
32. Plaintiff's employment with defendant-employer in which she was working on July 17, 1997 was that of a full-time flight attendant. By July 1, 1997 plaintiff had returned to full-time employment as a flight attendant and was on track to continue working 70 to 80 hours per month.
33. The collective bargaining agreement covering flight attendants for the period July 1997 guaranteed plaintiff an hourly rate of pay of $36.63 and payment for a minimum of 71 hours per month. During the month of July, plaintiff was scheduled to work 81 hours. Assuming that she could work 71 to 81 hours per month, this averages to 76 hours per month, which yields wages of $2,783.88 per month, or $33,406.56 per year and $640.67 per week.
34. By the end of September 1997, Alexsis, the servicing agent, had received at least two medical notes from different physicians, which related a new accident when the plane on which plaintiff was working encountered turbulence in July 1997, causing reinjury to plaintiff. In this regard, the workers' compensation servicing agent had actual notice of a potential new claim arising out of the new incident.
35. Plaintiff's Form 18 regarding the accident of July 17, 1997 was filed by her attorney with the Commission on December 15, 1997. The Form 62 Notice of Reinstatement of Benefits was filed with the Commission on or about December 15, 1997. Even if plaintiff failed to give written notice of her accident within 30 days, defendants had notice of the same and have failed to meet the burden of proof that any such failure to give timely written notice of her July 17, 1997 accident prejudiced defendants.
36. Plaintiff first retained Dan Walden as her counsel in October 1997. At that time she was receiving ongoing benefits at the rate of $275.82 per week, which payments had resumed in August 1997. However, no Form 62 had been completed at that time. Plaintiff has submitted an affidavit in which she states her belief that "it is only because of Mr. Walden's appearance, representation, and setting out alternative claims that Alexsis on or after December 15, 1999, unilaterally completed the Form 62, giving written notice to me and the Commission of `reinstatement' of my worker's compensation benefits at $275.82 per week for a `May 29, 1992' accident." Plaintiff voiced her support for Mr. Walden's request for twenty-five percent of all benefits paid to her since January 1, 1999, not just net benefits due.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 17, 1997, plaintiff sustained a new injury by accident arising out of and in the course of her employment with defendant US Airways, resulting in injury to her lower back. N.C. Gen. Stat. §97-2(6).
2. As a result of her July 17, 1997 injury by accident, plaintiff has been unable to earn wages in any employment and has been totally disabled beginning July 18, 1997 and continuing. She is entitled to benefits during this period, and until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Calculation of plaintiff's average weekly wage based upon the 52 weeks preceding her injury of July 17, 1997 would not yield results which are fair or just because, during most of the 52-week period prior to July 17, 1997, plaintiff was working for defendant-employer on a reduced hour basis of about 50 to 55 hours a month, due to her prior injury by accident. The best option is use of such other method "as will most nearly approximate the amount the injured employee would be earning were it not for the injury." Plaintiff was earning $36.63 per hour and was guaranteed payment for 71 hours per month and was scheduled to work 81 hours in July 1997. Assuming that she could work 71 to 81 hours per month, this averages to 76 hours per month, which yields wages of $2,783.88 per month, or $33,406.56 per year, and $640.67 as an average weekly wage. This results in a compensation rate of $427.13 per week. N.C. Gen. Stat. § 97-2(5).
4. Defendants are entitled to a credit of $275.82 per week for all weekly total disability compensation benefits paid to plaintiff by defendants since August 1, 1997. N.C. Gen. Stat. § 97-42.
5. As a result of her July 17, 1997 injury by accident, plaintiff has incurred expenses for medical and psychiatric care, which care was reasonably necessary to effect a cure, give relief, or lessen the period of plaintiff's disability. Defendants are responsible for payment of all such reasonably necessary medical and psychiatric treatment. N.C. Gen. Stat. §§ 97-2(19), 97-25. The approved medical expenses include the evaluation and treatment by Dr. Dichoso-Wood, Dr. McLean at Whitaker Rehabilitation Center, Dr. Thotakura at Winston Psychiatric Associates, P.A., and the pain specialists at Piedmont Anesthesia and Pain Consultants, P.A., but do not include payment for the whirlpool tub in plaintiff's home.
6. Defendants failed to establish that they have been prejudiced by any lack of written notice within 30 days of the accident of July 17, 1997. N.C. Gen. Stat. § 97-22.
7. Plaintiff's counsel has rendered valuable legal assistance in establishing plaintiff's claim for benefits based upon a new injury by accident, as well as approval for additional medical and compensation benefits. Where plaintiff has been receiving ongoing benefits at the rate of $275.82 per week, this case has resulted in an increase in plaintiff's compensation benefits of $151.31 per week to a rate of $427.13 per week. Plaintiff has stated her support for her counsel's fee request of 25% of all benefits due her under this Opinion and Award based upon the new rate of $427.13 per week, not just based upon the net increase of $151.13. Although this will significantly decrease the net benefits to plaintiff, there is still a net increase of benefits of $44.53 per week to plaintiff and plaintiff has expressed her desire and intentions for this fee to be approved for plaintiff's counsel. Therefore, 25% of all benefits accrued since January 1, 1999, as well as ongoing benefits, shall be approved as a reasonable attorney's fee. N.C. Gen. Stat. §97-90.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation benefits at the rate of $427.13 per week beginning July 18, 1997 and continuing until further order of the Commission. This amount is subject to a credit for all amounts paid to plaintiff during this period at the rate of $275.82 per week, and is subject to the attorney's fees approved below. All amounts that have accrued to date shall be paid in a lump sum.
2. Defendants shall pay all expenses for medical treatment rendered or to be rendered to plaintiff, as may be reasonably necessary to effect a cure, give relief, or lessen the period of disability from her July 17, 1997 accident. The approved medical expenses include treatment by Drs. Dichoso-Wood, McLean, Thotakura and pain specialists at Piedmont Anesthesia and Pain Consultants, but do not include payment for the whirlpool tub.
3. Defendants shall withhold and pay directly to plaintiff's attorney 25% of all accrued benefits which are payable to plaintiff under this Opinion and Award at the rate of $427.13, beginning January 1, 1999 and continuing through the date of this Opinion and Award. In the future, every fourth compensation check of $427.13 per week shall be paid directly to plaintiff's counsel as a reasonable attorney's fee.
4. Defendants shall pay all costs.
This the ___ day of September 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________ RENE C. RIGGSBEE COMMISSIONER
LKM/mhb